## NATIONAL LABOR RELATIONS BOARD v. BROWN & SHARPE MFG. CO.

No. 4336.

Circuit Court of Appeals
First Circuit.
July 30, 1948.

332

Mozart G. Ratner, Atty., of Washington, D. C. (David P. Findling, Associate Gen. Counsel, Ruth G. Weyand, Acting Asst. Gen. Counsel, and Frederic D. Vincent, Jr., Atty., all of Washington, D. C., on the brief), for petitioner.

Eugene J. Phillips, of Providence, R. I. (Dana M. Swan, and Swan, Keency, & Smith, all of Providence, R. I., on the brief), for respondent.

Before DOBIE, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

The question for decision on this petition for enforcement of an order of the National Labor Relations Board is whether as a matter of law the "time-study men", so called, excluding supervisors, in the Respondent's plant in Providence, Rhode Island, are "employees" within the meaning of § 2(3) of the National Labor Relations Act, 49 Stat. 450, as amended by § 101 of the Labor Management Relations Act, 1947, c. 120, P.L. 101, 1st Sess. 80th Cong., and constitute a unit appropriate for the purposes of collective bargaining within the meaning of § 9(b) of the former Act, 49 Stat. 453, as amended by the above section of the latter Act, 29 U.S.C.A. §§ 152(3), 159(b).

In the brief filed on behalf of the Respondent, a large manufacturer of machine tools and related products, it is conceded that the Board accurately stated the pertinent facts as follows:

"The Company's collective bargaining contract with the Union representing production employees [1] prescribes hourly rates of pay for such employees. However, under the incentive wage plan in effect these hourly rates of pay are translated into piecework rates by means of time studies. Thus, if after a time study, the standard time for any particular operation is fixed at one half hour, the employee receives one-half of his hourly rate for each such unit of work performed. The operator is thus enabled, by expending greater effort, to earn more than his hourly rate prescribed in the contract. On the other hand, if the operator consumes more than the standard time allotted for an hour's operations he is given the hourly rate provided for in the agreement.

"The function of determining the time standards for each operation is the primary responsibility of the time-study men. By means of a stop watch and the application of specialized knowledge and experience gained both at the plant and at technical schools, the time-study men time each operation and initally fix the time standard for the job. The time study is not a mere routine operation but requires the use of judgment, particularly in respect of the making of corrective allowances.

"If the operator is dissatisfied with the results of the time study, he has the right, under the collective bargaining contract, to make the study a subject of grievance proceeding. When this occurs, a second time study is usually made in the presence of a Union official and a department foreman or subforeman. Thereafter a labor-management meeting is held, under the chairmanship of a representative of the Company, to consider the grievance. At this meeting, the time-study man who made the study concerning which disagreement exists carries the burden of explaining and justifying his findings. However, his appearance before the meeting is as an expert witness; he does not participate in negotiations leading to settlement of the dispute.

---

[1] This is not the Union involved in the instant proceedings.

"In addition to making time studies, time-study men estimate the probable cost of manufacturing new products, suggest methods of increasing productive efficiency, and sign all allowance cards previously approved by a department foreman.

"Allowance cards are records of allowances made to operators of machines for additional time required to perform an operation because of the existence of non-standard conditions in the work. The allowances are actually granted by the foremen. The time-study man's examination of these cards is perfunctory and his approval is, apparently, only a matter of form."

On these facts the Board, one member dissenting, concluded that the Respondent's time-study men, though "highly important technical employees in whom the Company places considerable trust and confidence and upon whose judgment it relies", did not fall within its definition of "managerial" or "confidential" employees in the Ford case,[2] as the Respondent contended, but were " 'employees' within the meaning of § 2(3) of the National Labor Relations Act" and constituted "a distinct and functionally homogenous group who comprise an appropriate separate unit" for the purposes of collective bargaining. In consequence the Board entered the order which it now seeks to have enforced directing the Respondent in the usual form to bargain collectively with the Union chosen by its time-study men in an election as their representative.

Were we to decide this case, as the Board did, under the National Labor Relations Act as it stood before it was amended by the Labor Management Relations Act, 1947, we would not hesitate for long in granting the Board's petition for enforcement of its order. For in Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, 67 S.Ct. 789, 791, 91 L.Ed. 1040, the Supreme Court held that foremen, although supervisory personnel, were obviously "employees both in the most technical sense at common law as well as in common acceptance of the term" and hence were entitled to the organizational privileges of the Na-

tional Labor Relations Act even though, "standing between management and manual labor," they were called upon to act in the interest of their employer and so in some aspects of their work were employers within the definition of that word in § 2(2) of the Act. See also National Labor Relations Board v. E. C. Atkins & Co., 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563, and National Labor Relations Board v. Jones & Laughlin Steel Corp., 331 U.S. 416, 67 S. Ct. 1274, 91 L.Ed. 1575, in which it was held that plant guards, both non-militarized and militarized, although having disciplinary functions with respect to other personnel, were also entitled to the Act's organizational privileges.

Therefore as we see it the determinative question for us to decide is whether the Board's order, although enforceable when it was entered, is not enforceable now because of the changes made since its entry in the National Labor Relations Act by the Labor Management Relations Act, 1947.

The principal amendments of the earlier Act relied upon by the Respondent in support of its contention that the Board's order ought not to be enforced but instead set aside are those of § 2(3) by which "any individual employed as a supervisor" is specifically excluded from the scope of the definition of the term "employee" when used in the statute as it now stands, and the definition of the term "supervisor" in new § 2(11) of the statute to mean "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

The Respondent's argument is that the findings and conclusions of the Board quoted above clearly established that the authority of the time-study men involved was "not of a merely routine or clerical nature" but required "the use of independent

---

[2] Matter of Ford Motor Company (Chicago Branch) 66 N.L.R.B. No. 157.

judgment," indeed that the Respondent in fact relied upon their judgment, and this the Respondent says establishes that its time-study men are not excluded from the definition of a "supervisor" by reason of the generally routine nature of their duties. Then it says that they have been found by the Board to be squarely within the statutory definition of the term "supervisor" because the findings quoted above clearly show that they are clothed with specific authority not only to "reward" other employees, but also to "adjust their grievances," or at least "effectively to recommend such action."

The Board does not deny that the Respondent's time-study men are called upon to exercise their independent judgment in the exercise of such authority as is conferred upon them. Nor does it deny that the Respondent relies upon their judgment. But it says that the Respondent's contention that its time-study men have authority to "reward" other employees, or effectively to recommend such action, rests upon a distorted construction of that term as used in § 2(11) of the Act, and that its contention that its time-study men "adjust" the "grievances" of their fellow employees, or effectively recommend such adjustment, is equally fallacious because the findings do not show that they even participate in negotiations leading to the adjustment of grievances, but only that they give expert testimony at hearings held on grievances by representatives of higher management.

We cannot agree with the Respondent that on the findings thus far made by the Board it must be held as a matter of law that the time-study men involved are "supervisors" within the present statutory definition of that term, and hence are not employees entitled to the organizational privileges of the Act.

We of course concede, as the Board does, that the findings establish that the authority exercised by the time-study men in the Respondent's plant, in some of its aspects at least, "is not of a merely routine or clerical nature, but requires the use of independent judgment." But we do not think that it has yet been clearly determined by the Board that they have "authority" to "reward," or to "adjust" the "grievances" of, their fellow employees, or effectively to recommend such action, within the intendment of those words in the statute.

The words just quoted in some contexts might possibly be construed broadly to include within their sweep employees having authority to perform merely mechanical duties with respect to rewarding their fellow employees or adjusting their grievances, such for instance as calculating pay earned from data supplied or taking statements from witnesses for use in grievance proceedings. But the words must be viewed in their setting in § 2(11), and so viewed it seems to us evident that Congress meant to embrace within their scope only employees with authority to use their independent judgment with respect to some one or more of the specific authorities enumerated. Thus it is not of consequence that the Respondent's time-study men have been found to possess authority to use their independent judgment with respect to some aspects of their work; the decisive question is whether they have been found to possess authority to use their independent judgment with respect to the exercise by them of some one or more of the specific authorities listed in § 2(11) of the Act as amended.

Considered thus we think it clear that the Board has not found that the Respondent's time-study men have authority to "adjust" the "grievances" of their fellows. The most that has been found so far is that they have authority to testify as expert witnesses in grievance proceedings, and while an expert witness is called upon to use his independent judgment in determining what he shall say, it does not follow that his independent judgment is called upon to adjust a grievance. What is included in the meaning of the statutory language, we think, is the use of independent judgment in collecting, analyzing, evaluating and considering pertinent data for the purpose of determining the validity of a grievance, and it has been found that representatives of higher management, not time-study men, have authority to do this.

The question with respect to the authority of the Respondent's time-study men to

"reward" their fellow employees is not so easy. Analytically it is hard to say whether the Board has in effect found them to possess this authority in the statutory sense or whether it has not. But close analysis of the findings in the light of the language of the statute as amended does not seem to us appropriate at this time.

■ We can say that standing alone the Boards' finding that the Respondent's time-study men have authority to determine time standards for various production operations, although not a routine operation itself but one requiring the use of independent judgment, does not as a matter of law require that they be put in the supervisor class, and so deprived automatically of the organizational privileges of the Act, on the ground that they have authority in the interest of the employer to reward other employees. We say this for the reason that we may safely assume that time-study men as a general class have authority to use their independent judgment in making studies of the normal times required for the performance of various production operations for the purpose of administering incentive wage plans comparable to the Respondent's, or for allied purposes, and the legislative history of the Labor Management Relations Act, 1947, clearly indicates, that Congress did not intend to place time-study men as a class in the supervisory category.

In the amendments of the National Labor Relations Act proposed by the House (H.R. 3020, § 2(12) passed April 17, 1947) the term "supervisor" was defined broadly as "any individual— (A) who has authority, in the interest of the employer— (ii) to determine, or make effective recommendations with respect to, the amount of wages earned by any individuals employed by the employer, or to apply, or to make effective recommendations with respect to the application of, the factors upon the basis of which the wages of any individuals employed by the employer are determined, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the exercise of independent judgment;" and then in § 12(B) the term "supervisor" was defined specifically to include any individual "who is employed in labor relations, personnel, employment, police, or time-study matters or in connection with claims matters of employees against employers, or who is employed to act in other respects for the employer in dealing with other individuals employed by the employer, or who is employed to secure and furnish to the employer information to be used by the employer in connection with any of the foregoing. * * *" Thus obviously the term "supervisor" was defined by the House to include the Respondent's time-study men. But the Senate, and ultimately the Congress, rejected these provisions of the House Bill; the Conference Committee which reconciled the conflicting views of the House and Senate reporting (H.Rep. No.510, 80th Cong., 1st Sess. p. 35) as follows:

"(8) Supervisors.—As heretofore stated, both the House bill and the Senate amendment excluded supervisors from the individuals who are to be considered employees for the purposes of the act. The House bill defined as 'supervisors', however, certain categories of employees who were not treated as supervisors under the Senate amendment. These were generally (A) certain personnel who fix the amount of wages earned by other employees, such as inspectors, checkers, weighmasters, and time-study personnel, (B) labor relations personnel, police, and claims personnel, and (C) confidential employees. The Senate amendment confined the definition of 'supervisor' to individuals generally regarded as foremen and persons of like or higher rank.

"The conference agreement, in the definition of 'supervisor,' limits such term to those individuals treated as supervisors under the Senate amendment * * * The conference agreement does not treat time-study personnel or guards as supervisors, as did the House bill. Since, however, time-study employees may qualify as professional personnel, the special provisions of the Senate amendment (hereafter discussed) applicable with respect to professional employees will cover many in this category."

336

██ The question as we see it then is whether the particular duties of the Respondent's time-study men, in addition to their primary function of determining time standards for production operations, are such as to put them in a category of employees not entitled to the organizational privileges of the Act as it now stands. But this is a question which of course the Board was not called upon to consider and pass upon when it entered the order it here seeks to have enforced, because it entered that order before the passage of the Labor Management Relations Act, 1947. We think it ought to have an opportunity to do so now. We think in the orderly administration of the present Act the Board ought to be given an opportunity to review the facts and to make findings and reach conclusions with direct reference to the present statutory situation before we undertake to go further than to say that on the facts so far found the time-study men involved do not as a matter of law fall in the class of "supervisors" as that term is at present defined.

A decree will be entered setting aside the order of the Board and remanding the case to it for further appropriate proceedings.